1997–NMCA–026

936 P.2d 888

**In the Matter of DARCY S., A Child.**

**No. 16800.**

Court of Appeals of New Mexico.

March 12, 1997.

Tom Udall, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, for appellee.

Paul J. Kennedy, Mary Y.C. Han, Albuquerque, for appellant.

## OPINION

DONNELLY, Judge.

1. The Child, Darcy S., appeals from an order of the children's court transferring her to stand trial as an adult on the charges of murder, false imprisonment, aggravated as-

sault with intent to commit a violent felony, and conspiracy. Two issues are raised on appeal: (1) whether the Child's due-process rights were denied by the admission of the statements of a co-defendant; and (2) whether the Child's speedy-trial rights were violated. A third issue listed in the docketing statement was not briefed on appeal and is deemed abandoned. *State v. Calvillo*, 110 N.M. 114, 115, 792 P.2d 1157, 1158 (Ct.App. 1990). We affirm.

2. On November 24, 1992, the body of Adam Price, a seventeen-year-old youth (the victim), was discovered in a remote area of Socorro County, New Mexico. Subsequent investigation revealed that the victim had been killed by multiple bullet wounds from several weapons, including a shotgun. Following a Crime Stoppers broadcast concerning the homicide, police received a call from Jennifer Jones advising them that she had information implicating the Child, Eric Smith (Smith), and Mark Apodaca (Apodaca) in the victim's killing. Smith and Apodaca were subsequently charged as adults with the murder of the victim on January 21, 1994. The Child, who was seventeen years old at the time of the killing, was charged in the children's court with murder, with firearm enhancement, false imprisonment, aggravated assault with intent to commit a violent felony, conspiracy, and tampering with evidence. At the time the victim was killed, the Child was married to the co-defendant Smith. On January 27, 1994, the State moved, pursuant to NMSA 1978, Section 32-1-30 (Repl. Pamp.1989),[1] to transfer the Child to the district court for trial as an adult.

3. Following an extended evidentiary hearing on the motion to transfer, the children's court dismissed the charge of tampering with evidence, found that probable cause existed to believe that the Child committed each of the other acts charged in the petition, and that the Child was not amenable to treatment or rehabilitation as a juvenile. The order transferring the Child to stand trial as an adult specifically found that the Child "was fifteen years of age or more" at the time of the alleged offenses, that there

was probable cause to believe the Child committed each of the delinquent acts charged, except tampering with evidence, that the Child was not amenable to treatment or rehabilitation through available facilities, and that each of the other requirements of Section 32-1-30 had been satisfied. Based on its findings, the children's court ordered that the Child be transferred to district court for trial as an adult.

## I. *Admissibility of Statements*

4. During the hearing on the motion to transfer, the State called a number of witnesses, including Jennifer Jones and Brian Jones, her husband. The State also called as witnesses Smith and Apodaca, who were also charged with the victim's murder. Both Smith and Apodaca refused to testify at the Child's hearing on the motion to transfer, asserting their privilege against self-incrimination under the Fifth Amendment to the United States Constitution. The children's court declared each of them to be unavailable witnesses pursuant to NMRA 1997, 11-804, and permitted the State to elicit, over the Child's objection, statements of Smith and Apodaca implicating the Child in the murder of the victim. The Child argues this testimony violated her Sixth Amendment right to confrontation of witnesses and requires reversal of the children's court's transfer order.

5. In addressing this issue we first examine each of the statements involved. During the testimony of Jennifer Jones, she testified that in October 1993 she had separated from her husband, Brian Jones, and she was living with Apodaca and his wife. The witness testified that on the night of the shooting she was in the home of Apodaca in Albuquerque, and Apodaca, Smith, and the Child came back later with several weapons, and she saw blood on Smith and Apodaca. She also stated the three had been drinking.

6. Jennifer Jones also testified that on October 30, 1993, she was still residing in Apodaca's home and that Brian Jones called on the telephone and asked if they were watching the Crime Stoppers program on TV involving the killing of Adam Price. Jennifer

---

1. Section 32-1-30 was subsequently repealed by 1993 N.M.Laws, ch. 77 and replaced by NMSA 1978, Section 32A-2-20 (Repl.Pamp.1993), providing for the disposition of youthful offenders.

Jones then asked the Child what was going on and the Child told her that she, Smith, and Apodaca had gone out driving in Smith's Buick automobile and that "we" were looking for someone to pick up and scare. Jennifer Jones stated the Child stated they saw the victim walking down the street near East Central Avenue in Albuquerque, New Mexico. The Child stated that although they did not know him, Smith indicated that the victim appeared to be a perfect target because he "looked like a faggot." She stated that Smith said something to the victim and that the victim "flipped him off." Then Smith flashed a .44 caliber revolver and told the victim to get into the car. The Child told Jennifer Jones that the victim was put into the car and "things went bad." She stated the victim started "mouthing off and Smith started hitting him." Thereafter, they drove from Albuquerque to a remote area near Bernardo in Socorro County and "they shot him." On re-direct examination, Jennifer Jones was asked whether the Child had told her that she shot the victim, and the witness responded that the Child told her, "We shot him." Jones testified that the child primarily used a .44 caliber revolver. The Child told Jones that she would do anything or go anywhere to keep Smith, and she confided to Jones on the night of the Crime Stoppers broadcast that she did not care about the killing because the victim was a stranger.

7. Jennifer Jones also testified that the Child later showed her "where it happened." Following the Crime Stoppers tip, the police arrested Apodaca first. Jennifer Jones stated that on the night Apodaca was arrested, she telephoned the Child and inquired about the arrest, and the Child told her that the police did not have any proof. The Child told her that the barrel to the 9mm pistol and another part of the weapon were still in Apodaca's possession, and that Apodaca would not say anything because they had made a pact that whoever most of the evidence fell on would take the blame and not tell anything on anyone else.

8. Additionally, Jennifer Jones stated that approximately a month after the shooting, Brian Jones stated he needed a jacket and Smith handed him the jacket the victim had been wearing on the night he was shot, and Smith said, "Here, wear Adam's."

9. Brian Jones, the estranged husband of Jennifer Jones, was also called by the State as a witness. He testified that he was a friend of both Smith and Apodaca, and that, about a week after the victim was shot, he was at Apodaca's house in Albuquerque and he heard Smith say, "We killed somebody." The Child objected to this statement on the grounds of hearsay and the children's court overruled the objection, finding that the statement was an exception to the hearsay rule as a statement against interest. NMRA 11–804(B)(3). The Child also objected on the grounds that the State failed to lay a proper foundation for the admission of such statement. The children's court overruled the objection and defense counsel made a continuing objection as to any statements by Smith or Apodaca concerning the Child.

10. Brian Jones also testified that Smith told him that after they abducted the victim they drove to Socorro County and they took the victim out of the car, made him kneel down, and shot him. Jones also stated that the Child told him that "I shot Adam once in the face." Jones additionally testified that Smith told him that "he was proud to find a woman that would actually kill for him."

11. State Police Agent Michael Davies was also called to testify at the transfer hearing. Davies testified that on December 15, 1993, he had received a break in the case through a Crime Stoppers tip. Based on this information, he obtained arrest warrants for the Child, Smith, and Apodaca. In conducting his investigation, Davies testified that he spoke to Jennifer Jones and she told him that the Child had confided to her that she, Smith, and Apodaca had killed the victim. Davies stated that when he arrested Apodaca, he obtained a written statement from Apodaca. The children's court initially sustained an objection by the Child's attorney to the introduction of this statement, but later admitted the statement as a declaration against penal interest.

■ 12. As a preliminary matter, the State suggests that the statements of Smith and Apodaca were admissible because the Rules of Evidence do not apply in transfer

hearings in children's court. We disagree. Under NMRA 1997, 10–115, the Rules of Evidence apply in all proceedings in children's court except as otherwise provided by the Children's Court Rules. We see nothing in the Children's Court Rules, and nothing in the applicable statutes, that provides otherwise. *See* NMRA 1997, 10–227 (adjudicatory hearings); § 32–1–30(A)(2) (hearing on transfer to be made on conformity with hearing on petition alleging delinquent act); NMSA 1978, § 32–1–31 (Repl.Pamp.1989) (hearing on petition alleging delinquent act). The Rules of Evidence therefore apply in transfer hearings; however, the Rules of Evidence themselves contain exceptions to their applicability. The State cites NMRA 1997, 11–1101(D)(1) in support of its argument, which provides:

> D. **Rules inapplicable.** The [Rules of Evidence] (other than those with respect to privileges) do not apply in the following situations:
>
> (1) **Preliminary questions of fact.** The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 11–104[.]

The State argues that a transfer hearing involves the determination of a preliminary question of fact and therefore the Rules of Evidence do not apply. At a transfer hearing, the children's court must determine whether the child is amenable to treatment or rehabilitation as a child and whether there are reasonable grounds to believe that the child committed the alleged delinquent act. Section 32–1–30(A)(4), (5). These questions, however, are not "questions of fact *preliminary to admissibility of evidence.*" (Emphasis added.) We conclude that the exception in NMRA 11–1101(D)(1) is inapplicable, and the Rules of Evidence do apply in transfer hearings.

■ 13. The Child argues that admission of Smith's and Apodaca's statements violated the hearsay rule and the Confrontation Clause, U.S. Const. amend. VI; N.M. Const. art. II, § 14. The standard of review for the issue of whether the admission of evidence violates an accused's rights under the Confrontation Clause is a question of law which is reviewed de novo on appeal. *State v. Ross,* 122 N.M. 15, 22, 919 P.2d 1080, 1087 (1996). We need not resolve this issue here, however, because even if the statements should not have been admitted, the dispositive issue is whether in light of the other evidence adduced at the transfer hearing the evidence was prejudicial. Under the record before us, we conclude that the admission of the statements in question was harmless. The statements were merely cumulative and there was ample other evidence to support the decision to transfer the Child's case. *See D.D.P. v. State,* 595 So.2d 528, 532–33 (Ala. Crim.App.1991) (discussing admissibility of evidence at transfer hearing); *State v. Rurup,* 272 N.W.2d 821, 823 (S.D.1978) (admission of hearsay evidence at transfer hearing held harmless when such evidence was cumulative, and ample other evidence supported transfer). Here, the Child's own admissions were sufficient to support the children's court's determination that there were reasonable grounds to believe that the Child committed the alleged delinquent acts. *See* § 32–1–30(A)(5).

## II. *Claim of Speedy–Trial Violation*

14. The Child also argues that her right to a speedy trial under the Sixth Amendment to the United States Constitution was violated by a delay of approximately fifteen months which occurred after the children's court made its determination of probable cause and prior to the entry of a final order in the transfer proceeding. Responding to this argument, the State asserts that the right to a speedy trial does not exist in children's court proceedings. Alternatively, the State argues that even if a constitutional speedy-trial right is found to apply, such right was not violated under the circumstances existing here.

15. The State contends that because delinquency proceedings in the children's court are not characterized as criminal in nature under NMSA 1978, Section 32–1–33 (Repl. Pamp.1989), the right to a speedy trial is not implicated unless or until a child is transferred to stand trial as an adult and is formally indicted or charged by information on such charges. We disagree.

■ 16. We hold that constitutional speedy-trial requirements guaranteed under the Sixth Amendment of the United States Constitution also apply in children's court proceedings in New Mexico. *See State v. Henry*, 78 N.M. 573, 574, 434 P.2d 692, 693 (1967) (per curiam) (same constitutional standards apply to juveniles as to adults); *see also* NMSA 1978, § 32A-2-14(A) (Repl. Pamp.1993) (child charged with the commission of a delinquent act "is entitled to the same basic rights as an adult, except as otherwise provided in the Children's Code").

17. Courts in other jurisdictions that have also considered this issue have arrived at a similar conclusion. *See In re D.H.*, 666 A.2d 462, 473 (D.C.1995); *P.V. v. District Court*, 199 Colo. 357, 609 P.2d 110, 111–12 (1980) (en banc); *In Interest of C.T.F.*, 316 N.W.2d 865, 868–69 (Iowa 1982); *In re Welfare of J.D.P.*, 410 N.W.2d 1, 3 (Minn.Ct.App.1987); *Piland v. Clark County Juvenile Court Servs.*, 85 Nev. 489, 457 P.2d 523, 524–25 (1969); *Brooks v. State*, 654 P.2d 1054, 1056 (Okla. Crim.App.1982).

■ 18. Having determined that the Sixth Amendment speedy-trial right is applicable to children's court cases, we turn next to an examination of the Child's contention that such right was violated in the present case.

19. The transfer hearing began on March 23, 1994, within the time limit prescribed by NMRA 1996, 10–223.[2] After the State presented the testimony of Jennifer Jones and Agent Davies, the children's court granted the State's request for a brief continuance in order to obtain the attendance of an out-of-state witness, Brian Jones. The hearing was rescheduled for April 4, 1994. At the hearing on April 4, 1994, the State called both Smith and Apodaca as witnesses. Counsel for both witnesses informed the children's court that their clients invoked their Fifth Amendment privilege against self-incrimination. The children's court then ruled that the witnesses were "unavailable," within the meaning of NMRA 11–804. Thereafter, the children's court granted a continuance to April 11, 1994, due to a scheduling conflict of an attorney for a co-defendant. At the conclusion of the hearing on April 11, 1994, the children's court found that probable cause existed to believe that the Child committed each of the offenses charged in the petition, except the charge of tampering with evidence. Thus, approximately one month elapsed from the time the transfer hearing commenced and the children's court found that there were reasonable grounds to believe that the Child committed the delinquent acts in question.[3]

20. Following the children's court's determination of probable cause on April 11, 1994, approximately fifteen months elapsed until the children's court concluded the second portion of the transfer hearing and ruled upon the issue of the Child's amenability to treatment or rehabilitation through available facilities in accordance with former Section 32–1–30(A)(4).

■ 21. When a transfer proceeding is commenced within the time period required by statute and prosecuted in a timely manner, the period of time necessary to conclude such hearing is properly excluded from any assertion of a constitutional speedy-trial violation. However, where transfer proceedings

---

**2.** NMRA 10–223(B) (withdrawn effective·Oct. 1, 1996) directed that if a child is not in detention,

> the transfer hearing shall be commenced within ninety (90) days from whichever of the following events occurs latest:
>
> (1) the date the motion for transfer is filed;
>
> (2) if the proceedings have been stayed on a finding of incompetency to participate in the transfer hearing, the date an order is filed finding the [child] competent to participate in a transfer hearing; or
>
> (3) if the [child] fails to appear at any time required by the court, the date the [child] is taken into custody after the failure to appear.

**3.** At the transfer hearing on April 11, 1994, the following colloquy occurred:

> Judge: Anything else to take up today in connection with this matter?
>
> Child's counsel: No sir.
>
> State's attorney: No sir. Just that pursuant to the law, the time is tolled for purposes of the ninety days.
>
> Judge: Alright. I think you would agree, would you not, Mr. Bernstein, we're making every effort to move the case along.
>
> Child's counsel: Yeah. I think they are making an effort.
>
> Judge: Okay.

are interrupted for an extended period of time, the resulting period of delay may trigger a speedy-trial claim. *Cf. United States v. Andrews*, 790 F.2d 803, 808 (10th Cir.1986) (delay of two and one-half months between voir dire and the presentation of testimony sufficient to give rise to challenge under federal Speedy Trial Act, 18 U.S.C. § 3161(d)(1)). Under the facts before us, we conclude that the interruption and delay in concluding the transfer hearing, which occurred after April 11, 1994, was presumptively prejudicial so as to require application of the constitutional speedy-trial analysis as delineated by *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). *Barker* identified four factors which the court is required to assess in determining whether a defendant has been deprived of his or her Sixth Amendment right to a speedy trial under the United States Constitution. The factors enumerated in *Barker* are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice resulting from the delay. Each of the four factors is weighed after considering the facts and circumstances of that particular case; no single factor is determinative. *See State v. Williams–Rusch*, 928 P.2d 169, 176 (Mont. 1996). Applying this analysis to the facts herein, we conclude:

### A. *Length of Delay*

■ 22. The period of delay is not solely determinative of whether a Sixth Amendment speedy-trial right has been infringed. *Salandre v. State*, 111 N.M. 422, 427, 806 P.2d 562, 567 (1991). A delay of fifteen months in concluding a transfer hearing in a juvenile case with extended interruptions in such proceedings, raises sufficient concerns so as to require the State to justify continued prosecution of the charges against the Child. *See id.* at 428, 806 P.2d at 568 (after there has been a showing of a presumptively prejudicial delay, burden shifts to state to establish on balance accused's speedy-trial rights were not violated). When considering the length of delay for speedy-trial purposes, we give no weight to which party caused the delay. *See id.* at 427–28, 806 P.2d at 567–68; *see also State v. Lane*, 927 P.2d 989, 992

(Mont.1996). We balance this factor in favor of the Child.

### B. *Reasons for the Delay*

23. After the children's court announced its findings of probable cause, the court directed the parties to advise it of the name of the psychologist by April 20, 1994, whom they wanted the children's court to select in order to carry out a psychological evaluation of the Child. The Child originally agreed to stipulate to a psychologist named by the State, but several weeks later informed the children's court that she would not agree to that expert. Thereafter, the children's court instructed counsel to write a letter by May 23, 1994, advising it of each party's choice of a court-appointed expert. The State notified the court of its choice, Dr. Robert Zussman, on May 23, 1994, and the Child's attorney notified the court of the Child's choice, Dr. Moss Aubrey, on May 25, 1994.

24. On June 20 the children's court wrote to the parties advising them that each side could call its own expert at its own expense. The court also informed the parties that if they were unable to pay for their own expert, it would name the expert who would examine the Child. The children's court directed the parties to report back by June 24, 1994. Both parties advised the children's court that they would pay for their own expert and, on June 27, 1994, the children's court authorized each side to call its own expert.

25. On August 24, 1994, the Child's attorney notified the children's court that he would be unavailable from September 16 through October 10, 1994, and requested that the court not schedule any proceedings on those dates. On September 9, 1994, the court was notified that the State's psychologist had completed his report. A copy of the report was given to the Child's counsel. The State filed a request for a conference on November 30, 1994. The children's court set the conference for December 1, 1994. Following that conference, on December 12, 1994, the State requested a setting to complete the transfer hearing. Another conference was held on December 27, 1994, and counsel for the Child informed the children's

court that their expert had not completed his evaluation but that he would complete his examination by January 25, 1995. The written report of the Child's expert is dated January 20, 1995. Thereafter, the children's court scheduled January 25, 1995, as the date for completing the hearing on the amenability portion of the transfer hearing. Counsel for the Child sought a continuance of the transfer hearing because the Child's expert was unable to be present on the date set by the children's court. The children's court granted the continuance despite the State's objection.

26. Shortly after successfully obtaining a continuance, the Child's counsel filed a motion to dismiss the proceedings against the Child on February 13, 1995. The children's court denied the motion, and heard testimony from Dr. Zussman, the State's expert, on May 10, 1995, May 19, 1995, and June 5, 1995. On June 23, 1995, counsel for the Child sought to call three additional witnesses. The children's court denied the motion. Dr. Aubrey, the Child's expert witness, testified on June 26, 1995, and the parties presented closing arguments on July 12, 1995. At the conclusion of the hearing, the children's court ruled that the Child was not amenable to treatment as a juvenile and ordered that she be transferred to district court to stand trial as an adult.

27. On July 26, 1995, the State filed a motion for presentment of the order, and on August 14, 1995, the children's court formally entered the order directing that the Child be transferred to stand trial as an adult.

28. Our review of the record indicates that a significant portion of the delay in concluding the transfer proceedings was caused by delay on the part of the Child's expert in completing his examination of the Child, finalizing his report, and the presentation of his testimony on behalf of the Child. *See State v. Tarango*, 105 N.M. 592, 598, 734 P.2d 1275, 1281 (Ct.App.1987) (when a defendant causes or substantially contributes to delay, he or she cannot complain of denial of speedy trial), *overruled on other grounds by Zurla v. State*, 109 N.M. 640, 645, 789 P.2d 588, 593 (1990); *State v. Montoya*, 86 N.M. 119, 124, 520 P.2d 275, 280 (Ct.App.1974)

(delay did not entitle defendant to dismissal of charges where defendant was responsible in part for the delay). While it is the State's obligation to move a case forward, delays attributable to the defense are not charged against the State. *Williams–Rusch*, 928 P.2d at 177.

29. Our review of the record indicates that the children's court judge went to great lengths to assure the Child an opportunity to select her own expert, and to accord the Child a fair and complete opportunity to present her expert's testimony. Delay on the part of the Child's expert in concluding his evaluation and making himself available to testify significantly contributed to the delay complained of herein. Nevertheless, we determine that the State must also shoulder a portion of the responsibility for delay in concluding the proceedings. Although the children's court was engaged in other proceedings, including a criminal jury trial against another defendant, time lapses attributable to institutional delay are not charged against the defense. *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192; *see also Zurla*, 109 N.M. at 643, 789 P.2d at 591 (congestion of docket is a neutral reason for delay).

30. After reviewing the reasons for delay, we balance this factor evenly against both the State and the Child.

C. *Assertion of the Right*

31. The Child asserted her right to a speedy trial on February 13, 1995, after a nine-month hiatus in the transfer proceedings. We note, however, that the Child asserted this right shortly after seeking and obtaining a further continuance. In our view, responsibility for a substantial portion of the delay in the proceedings must rest with the Child. The manner in which a defendant seeks a speedy trial is entitled to strong evidentiary weight in deciding whether the defendant has been deprived of such right. *Barker*, 407 U.S. at 531–32, 92 S.Ct. at 2192. Here, the Child did not assert her speedy-trial right until after the children's court had scheduled the date of January 25, 1995, as the date for proceeding with the transfer hearing. Counsel for the Child objected to such date and requested a further

delay. The Child's speedy-trial demand came after approximately nine months had elapsed from the date the children's court made its findings of probable cause.

32. Considering the Child's contributing delay in concluding the proceedings both prior to and following her speedy-trial demand, we believe this factor should not be weighed in favor of either party. *See State v. Gallegos,* 109 N.M. 55, 63, 781 P.2d 783, 791 (Ct.App.1989) (declining to weigh defendant's assertion of speedy-trial right in favor of either party).

### D. *Prejudice to the Child*

 33. The last factor which must be analyzed under the *Barker* test is the prejudice, if any, suffered by the Child. Prejudice is assessed in light of the three principal interests which the speedy-trial right serves to protect. These are: (1) prevention of oppressive pretrial incarceration; (2) minimization of a defendant's anxiety and concern; and (3) prevention of impairment of the defense. *Zurla,* 109 N.M. at 644, 789 P.2d at 592. During all of the period encompassed by the transfer proceedings, the Child was not held in detention. Moreover, there has been no showing of any material impairment to the Child's defense.

34. We weigh the fourth factor, whether the Child suffered any prejudice as a result of the delay, against the Child. Although the Child unquestionably sustained anxiety re-

sulting from the delay in the proceedings and was subject to restrictions during the pendency of the transfer hearing, as previously observed, the Child substantially contributed to the delay herein and, thus, cannot take advantage of such delay. *Tarango,* 105 N.M. at 598, 734 P.2d at 1281; *see also State v. Henry,* 101 N.M. 277, 280, 681 P.2d 62, 65 (Ct.App.1984) (generally, party may not complain of matters which he or she urged upon trial court). Moreover, we believe there is no showing that the delay has materially impaired the Child's defense.

35. Although we do not condone the lengthy delay which existed here, after considering each of the *Barker* factors in light of the circumstances shown to exist, we find no error in the children's court's denial of the motion to dismiss.

### CONCLUSION

36. We affirm the order of the children's court transferring the Child to stand trial as an adult and denying the motion to dismiss.

37. IT IS SO ORDERED.

WECHSLER and BUSTAMANTE, JJ., concur.