2007-NMCA-046

157 P.3d 20

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Harry L. DOWNEY, Defendant–Appellant.**

**No. 25,068.**

Court of Appeals of New Mexico.

Feb. 9, 2007.

Certiorari Granted, No. 30,263, April 16, 2007.

Gary K. King, Attorney General Santa Fe, NM, Jacqueline R. Medina, Assistant Attorney General Albuquerque, NM, for Appellee.

Downing & Henderson, P.C., David Henderson, Santa Fe, NM, for Appellant.

## OPINION

FRY, Judge.

{1} In this case we consider the admissibility of retrograde extrapolation as a means for calculating Defendant's blood alcohol content (BAC) at the time of driving based on Defendant's BAC measured six hours after Defendant ceased driving. Defendant, who was convicted of vehicular homicide, appeals the trial court's admission of the State's expert's testimony giving an opinion as to Defendant's possible BAC at the time of the accident. Defendant challenged the validity of the expert's conclusions, not the reliability of retrograde extrapolation as a scientific technique. Relying on our Supreme Court's decisions discussing the admissibility of expert testimony, we conclude that such a challenge goes to the weight of the expert's testimony rather than to its admissibility. Consequently, we affirm the trial court's admission of this testimony.

{2} Defendant also contends that his constitutional right to a speedy trial was violated by the thirty-month delay between his arrest and the trial. We disagree and affirm.

## I. BACKGROUND

{3} This case arises from a collision on July 13, 2001, at about 7:00 p.m., between a pickup truck driven by Defendant and a pickup truck driven by Dorman Austin. Mr. Austin's wife, Beth Austin, was a passenger in the Austin vehicle. Defendant, who was sixty-eight years old at the time, was driving south from Melrose, New Mexico on Highway 286, while the Austins were proceeding north on the same highway. Defendant's truck suddenly swerved into the northbound lane, and the right rear panel of Defendant's truck collided with the front passenger side of the Austin vehicle. Mrs. Austin was killed in the collision.

{4} Immediately following the accident, Defendant left the scene, but he returned after five to ten minutes. At least three law enforcement officers arrived to investigate the accident, two of whom testified to smelling alcohol on Defendant's breath. Defendant denied having any alcohol to drink and told the officers that he could not drink because he has diabetes. One of the officers had Defendant perform field sobriety tests shortly after 10:00 p.m. and then transported Defendant to a hospital, where blood was drawn at 1:05 a.m., roughly six hours after the accident. The result was "0.04 grams per 100 mils of alcohol."

{5} Although there was testimony that Defendant stayed in his truck during the entire investigation at the scene, there was also testimony that Defendant was left by himself for periods of time. Officers discovered a nearly-empty whiskey bottle at the scene, which Defendant admitted belonged to him.

{6} Defendant was charged with vehicular homicide under two alternative theories: operating a motor vehicle while under the influence of intoxicating liquor, and operating a motor vehicle in a reckless manner. At trial, the State sought to introduce the testimony of Ron Smock, a toxicologist. Smock employed retrograde extrapolation to give an opinion as to Defendant's likely BAC at the time of the accident based on the known BAC determined from the blood test taken six hours after the accident. Defense counsel objected to the admission of this testimony on the ground that it was unreliable and not scientifically valid. After hearing Smock's foundation testimony and defense counsel's voir dire of Smock, the trial court determined Smock's testimony to be admissible. Smock testified that, using the body's standard rate of alcohol absorption and a

range of alcohol elimination, Defendant's BAC at the time of the accident was between 0.085 and 0.115. He testified that the range he used took into account variables such as the presence of food, metabolism, and health issues.

{7} Defendant called Dr. Edward Reyes, a pharmacologist, as an expert witness. Reyes agreed with Smock that retrograde extrapolation, or relation back calculations, can be used to determine BAC at an earlier time, based on a known BAC, but he opined that Smock had failed to take into account several variables that would affect the accuracy of the calculation. These variables include how the person slept, what he ate, what medication he was on, when he last drank, what he drank, how much he had to drink, and whether he had experienced a release of adrenaline. While Reyes agreed with Smock as to the rate the body eliminates alcohol, he questioned Smock's opinion because it assumed that the entire time between the accident and Defendant's blood test was post-absorptive. Any of the many variables could result in a delay in the absorption of alcohol, which could mean that Defendant's BAC at the time of the accident was actually lower than the 0.04 BAC in Defendant's blood six hours after the accident.

{8} The jury returned a general verdict finding Defendant guilty of vehicular homicide. This appeal followed.

## II. DISCUSSION

### A. Admissibility of Smock's Testimony

■ {9} Defendant argues that the trial court erred in admitting Smock's testimony because: (1) Smock was not qualified to testify as an expert witness, and (2) Smock's retrograde extrapolation calculation was unreliable because it failed to take into account the many variables that could impact the conclusion reached. Both of these arguments are rooted in Rule 11-702 NMRA, which provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training or education may testify thereto in the form of an opinion or otherwise.

This rule establishes three prerequisites for the admissibility of expert testimony: (1) the expert must be qualified; (2) the testimony must aid the fact finder; and (3) the expert may testify only as to "scientific, technical or other specialized knowledge." *State v. Alberico*, 116 N.M. 156, 166, 861 P.2d 192, 202 (1993) (internal quotation marks omitted).

### 1. Smock's Qualification as an Expert

{10} In the headings in his brief in chief Defendant contends that Smock was not competent to testify as an expert because he had no independent expertise in alcohol retrograde extrapolation. These headings appear to focus on the first prerequisite listed in *Alberico*, the qualification of the expert witness. However, it is clear that the substance of Defendant's argument is not directly related to Smock's qualifications. Instead, Defendant's arguments focus on Smock's purported failure to satisfy the third prerequisite listed in *Alberico* because Defendant claims Smock failed to consider relevant factors impacting the conclusions he reached in giving an opinion as to Defendant's likely BAC range at the time of the accident. In these arguments, Defendant relies on *Alberico*, and the cases following it, to discuss the requirement that expert testimony be based on reliable scientific or other technical knowledge. *Alberico* did not analyze or discuss what is required to establish the qualification of an expert witness, but instead focused on the third prerequisite to expert testimony. *Lopez v. Reddy*, 2005-NMCA-054, ¶ 12, 137 N.M. 554, 113 P.3d 377. Consequently, Defendant's emphasis on *Alberico* and the gaps in Smock's analysis is irrelevant to the contention in his brief's headings that Smock was not qualified. We therefore conclude Defendant is not in fact challenging Smock's background and qualifications.

■ {11} Even if Defendant appropriately challenged Smock's qualifications, we conclude the trial court did not err in finding Smock to be qualified to testify as an expert. A trial court "has wide discretion" in determining whether an expert witness is qualified to testify, "and the court's determination of

this question will not be disturbed on appeal, unless there has been an abuse of this discretion." *Lopez*, 2005–NMCA–054, ¶ 14 (internal quotation marks and citation omitted). "[N]o set criteria can be laid down to test [an expert's] qualifications. An expert can be qualified under a wide variety of bases: knowledge, skill, experience, training, or education." *Fleming v. Town of Silver City*, 1999–NMCA–149, ¶ 16, 128 N.M. 295, 992 P.2d 308 (alteration in original) (internal quotation marks and citations omitted).

{12} Smock is the chief toxicologist, certifying scientist, and assistant director for a forensic drug testing laboratory. He has specialized in testing "drugs of abuse," which include alcohol, for about twenty-four years. He did some research and development in toxicology for about four-and-a-half years. Although he does not have a college degree, he has the "B.S. equivalent as a medical technologist." He has testified as an expert about three hundred times, but this was only the second time he testified about elimination of alcohol over a period of time.

■ {13} We cannot say that the trial court abused its discretion in determining Smock to be qualified. While his experience in retrograde extrapolation may not have been vast, "[a]ny perceived deficiency in … education and training is relevant to the weight accorded by the jury to [the] testimony and not to the testimony's admissibility." *State v. McDonald*, 1998–NMSC–034, ¶ 21, 126 N.M. 44, 966 P.2d 752 (alterations in original) (internal quotation marks and citation omitted); *see also State v. Dorsey*, 93 N.M. 607, 609, 603 P.2d 717, 719 (1979) (stating that the jury assesses the relative weight of lay or expert testimony).

## 2. Reliability of Retrograde Extrapolation

■ {14} Defendant's primary contention on appeal is that Smock's failure to account for many variables potentially impacting Defendant's absorption rate rendered Smock's opinion scientifically unreliable under *Alberico's* third prerequisite. Defendant argues that Smock "simply assumed [Defendant] was in a post-absorption state at the time of the accident" and failed to consider whether Defendant consumed any alcohol between the accident and the blood test, whether he was on medication, what Defendant ate and when, whether Defendant was in shock from the accident, or the impact of Defendant's diabetes on the absorption of alcohol. Defendant cites to several articles stating that these factors are important to performing retrograde analysis, and he relies on courts in other jurisdictions that have refused to admit retrograde extrapolation testimony.

■ {15} We agree with Defendant that "[t]he trial court acts as a gatekeeper to ensure that the factfinder only considers reliable and relevant scientific evidence." *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003–NMSC–026, ¶ 32, 134 N.M. 421, 77 P.3d 1014. However, we conclude that Defendant's objection goes to the reliability of Smock's conclusions, which was a factual determination for the jury to make. We explain our conclusion by first reviewing the development of New Mexico's jurisprudence in this area, beginning with *Alberico*.

{16} In *Alberico*, our Supreme Court addressed the admissibility of a diagnosis of post traumatic stress disorder and listed the previously mentioned three prerequisites to the admission of expert testimony. 116 N.M. at 158, 166, 861 P.2d at 194, 202. Discussing the third prerequisite, the Court stated that the focus "should be on the validity and the soundness of the scientific *method* used to generate the evidence." *Id.* at 167, 861 P.2d at 203 (emphasis added).

{17} In the cases following *Alberico*, the Supreme Court continued to emphasize that a trial court's gatekeeping function must focus on the validity of the relevant scientific technique itself. In *State v. Anderson*, 118 N.M. 284, 881 P.2d 29 (1994), the Court addressed the FBI's method of "determining the probability of a coincidental DNA match" in a criminal case. *Id.* at 285–86, 881 P.2d at 30–31. The Court noted that while "scientists in population genetics have engaged in a heated debate over the accuracy of the FBI's methods," this was "a question of weight and not of admissibility." *Id.* at 298, 881 P.2d at 43. The Court then concluded "that the trial court may only examine whether the princi-

ples and methodology used are scientifically valid and generally accepted. The assessment of the validity and reliability of the conclusions drawn by the experts, however, is a jury question." *Id.* at 301, 881 P.2d at 46.

{18} Several years following *Anderson*, the Supreme Court continued in this vein when it addressed the admissibility of the field sobriety test known as horizontal gaze nystagmus in *State v. Torres*, 1999–NMSC–010, 127 N.M. 20, 976 P.2d 20. Again, the Court emphasized that a trial court's inquiry is the "threshold determination that the underlying 'scientific *technique* is based upon well-recognized scientific principle and . . . is capable of supporting opinions based upon reasonable probability rather than conjecture.' " *Id.* ¶ 40 (quoting *Alberico*, 116 N.M. at 167, 861 P.2d at 203) (emphasis added).

{19} Similarly, in *Lee v. Martinez*, 2004–NMSC–027, 136 N.M. 166, 96 P.3d 291, the Court determined that polygraph test results are sufficiently reliable to be admitted, "provided the expert is qualified and the examination is conducted in accordance with Rule 11–707." *Id.* ¶ 4. After noting various potential problems with polygraph results, the Court nonetheless concluded that "any doubt about the admissibility of scientific evidence should be resolved in favor of admission. The remedy for the opponent of polygraph evidence is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation." *Id.* ¶ 48 (citation omitted).

{20} In summary, our Supreme Court's cases in this area can be distilled into several guiding principles. First, a trial court's gatekeeping function is confined to an assessment of the reliability of the scientific technique underlying an expert's opinion, not the validity of the conclusions drawn by an expert employing that technique. Second, any deficiencies or infirmities in the actual performance of a scientific test go to the weight of the evidence, not to its admissibility. Third, doubt regarding the admissibility of scientific evidence should be resolved in favor of admissibility.

{21} Turning now to the present case, Defendant does not challenge the validity or reliability of retrograde extrapolation as a scientific methodology; instead, Defendant criticizes Smock's performance of retrograde extrapolation. Defendant's expert at trial, Dr. Reyes, did not testify that retrograde extrapolation, which he referred to as "relation back" technique, is scientifically unreliable or invalid. Indeed, Reyes testified that he has himself qualified to testify as an expert about the pharmacokinetics of alcohol about fifty-four times, and almost every case involved relation back. He testified that it is easy to perform a relation back calculation if he knows the person is in the elimination phase at the time of testing and if he knows how fast the person is eliminating the alcohol. Similarly, if he knows the person is in the absorption phase and how fast the person is absorbing, he can do a relation back calculation. Reyes agreed with Smock that almost everyone will fall within the elimination range of .015 to .03 per hour. However, variations occur in the rate of absorption, which can be impacted by medications, adrenaline, the amount of water in the body, and when and what the person ate or drank. Because Smock did not consider these things, Reyes concluded that Smock's calculation of relation back was not reliable.

{22} Thus, even Defendant's expert did not claim that retrograde extrapolation is an invalid or unreliable scientific technique. Reyes said only that Smock did not reliably perform the extrapolation. Defendant's arguments on appeal highlight this distinction. Defendant cites various articles in scientific journals emphasizing the need for consideration of the various factors impacting the relation back calculation. For example, Defendant cites an article stating that "[g]ood interpretation is unlikely to be made unless the forensic scientist has a thorough knowledge of the many factors [that] influence the absorption, distribution and metabolism of alcohol." A.R. Stowell & L.I. Stowell, *Estimation of Blood Alcohol Concentrations After Social Drinking*, 43(1) J. Forensic Science 20 (1998). This statement assumes that "good interpretation" is possible, which in turn means that relation back is a scientifically reliable technique. In addition, Defendant cites to other writers who "contend

under certain conditions retrograde analysis *can* be valid."

{23} We think the assessment of the scientific validity of retrograde extrapolation technique is analogous to the assessment of the validity of the FBI's DNA-matching technique in *Anderson.* In that case, our Supreme Court noted that the defendant, "by attempting to refute the FBI's theory and methods with evidence about deficiencies in both the results and the testing of the results, the defendants have conceded that the theory and methods can be tested[,]" thus satisfying one aspect of scientific reliability. 118 N.M. at 291, 297, 881 P.2d at 36, 42. Similarly, Defendant's emphasis on the deficiencies in Smock's results constitutes a concession that relation back technique can be tested. And, as in *Anderson,* the competing arguments about the adequacy or deficiency of Smock's calculation "involve[ ] a dispute over the accuracy of the . . . results, and thus this criticism goes to the weight of the evidence, not its admissibility." *Id.* at 299, 881 P.2d at 44 (internal quotation marks and citations omitted). When accuracy of the results is at issue, "[w]ith adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable." *Id.* at 301, 881 P.2d at 46 (internal quotation marks and citation omitted).

{24} This is precisely what the trial court permitted in the present case. Defense counsel conducted an extensive voir dire of Smock while the jury was present and vigorously cross-examined Smock regarding the paucity of literature he relied on, the assumptions he made, and the many variables that could impact the relation back calculation. Defense expert Reyes's testimony noted the flaws in Smock's calculation, including Smock's use of averages and the many factors that Smock failed to consider that affect the calculation. Reyes explained in detail why Smock's calculation was unreliable and opined that "[t]here [are] too many things I don't know to be able to give an alcohol level at [the time of driving]." Reyes testified

that he did not consider Smock's opinions "seriously because [Smock] assumed that [Defendant] was in the post-absorptive phase all the way through that whole [post-accident] time period." In addition, the trial court instructed the jury:

> You should consider each opinion received in evidence in this case and give it such weight as you think it deserves. If you should conclude that the reasons given in support of the opinion are not sound or that for any reason an opinion is not correct, you may disregard the opinion entirely.

{25} These tools for weighing the validity of Smock's testimony permitted the jury to determine whether to give more weight to the testimony of Smock or Reyes, which is the jury's function. Defendant objected to Smock's misuse of the retrograde extrapolation technique, not to the invalidity of the technique itself. Under these circumstances, we cannot say the trial court abused its discretion in admitting Smock's testimony and allowing the jury to assess the validity of Smock's opinions through consideration of defense counsel's cross examination, Reyes's challenging testimony, and the relevant jury instruction.

{26} We are not persuaded otherwise by Defendant's reliance on cases from other jurisdictions. In *Commonwealth v. Gonzalez,* 519 Pa. 116, 546 A.2d 26 (1988), the expert witness himself testified that he could not give an opinion as to the defendant's BAC, based on a test taken three hours after the accident, without knowing when the defendant had taken his last drink. *Id.* at 32. Smock did not make such an admission. In *State v. Wolf,* 605 N.W.2d 381, 385 (Minn. 2000), the court affirmed the exclusion of expert testimony on retrograde extrapolation because the defendant failed to make an offer of proof in the trial court, and, therefore, the record was insufficient for review. In *Smith v. City Tuscaloosa,* 601 So.2d 1136 (Ala.Crim. App.1992), where the court rejected the defendant's unpreserved objections to retrograde extrapolation testimony, the court quoted a law review article critical of retrograde extrapolation but only in support of its cautionary note that its opinion "should not

be interpreted as any tacit approval of the use of retrograde extrapolation." *Id.* at 1140. As for *Commonwealth v. Shade*, 545 Pa. 347, 681 A.2d 710 (1996), we were not able to find in it the proposition for which Defendant cites it.

{27} We are also unpersuaded by the case Defendant cites for "[t]he most thorough discussion" of the issue, *Mata v. State*, 46 S.W.3d 902 (Tex.Crim.App.2001) (en banc). In that case, the appellate court reversed the trial court's admission of the state's expert's opinion testimony as to a range of BACs at the time of driving based on breath tests taken from the defendant two hours later. *Id.* at 904. This case is not persuasive for two primary reasons. First, in Texas, the proponent of scientific evidence "must demonstrate by clear and convincing evidence that the evidence is reliable." *Id.* at 908. In New Mexico we do not impose such an enhanced burden of proof on the proponent of evidence. Second, the court in *Mata* imposed an additional requirement on the proponent: to show "proper application of the technique on the occasion in question." *Id.* (footnote omitted). This requirement is contrary to New Mexico law, which holds that "[t]he assessment of the validity and reliability of the conclusions drawn by the experts ... is a jury question." *Anderson*, 118 N.M. at 301, 881 P.2d at 46. Interestingly, the dissent in *Mata* expressed a view closer to New Mexico law, stating that "[d]isagreements between experts about the variables and correct elimination rates to be applied go to the weight of the evidence as do the differences in the experts' credentials." 46 S.W.3d at 925 (Keller, P.J., dissenting) (internal quotation marks, citation, and footnote omitted).

{28} We do not agree with Defendant that our decision in *State v. Hughey*, 2005–NMCA–114, 138 N.M. 308, 119 P.3d 188 compels reversal in this case. In *Hughey*, we affirmed the trial court's exclusion of the defendant's BAC level measured four hours after driving. *Id.* ¶¶ 12, 14. We concluded that BAC is relevant only if it "tells the fact finder something about [the d]efendant's BAC at the time of the accident." *Id.* ¶ 9. The State's expert did not provide an opinion as to the defendant's likely BAC at the time

of driving, and he relied on several assumptions about the defendant's drinking pattern. *Id.* ¶ 4. We stated that the expert's testimony "was so vague and general as to provide no real assistance to the trier of fact." *Id.* ¶ 11.

{29} *Hughey* is distinguishable from the present case for two reasons. First, the trial court in *Hughey*, unlike the trial court in this case, excluded the evidence. Under an abuse of discretion standard of review, we appropriately gave considerable deference to the trial court's ruling. *State v. McClaugherty*, 2003–NMSC–006, ¶ 17, 133 N.M. 459, 64 P.3d 486. We give the same deference to the trial court's decision to admit the evidence in this case. Second, in *Hughey* the issue was the admissibility of the BAC reading, while the focus in this case is the admissibility of expert testimony. The present case falls squarely within the ambit of the *Alberico* line of cases, and those cases persuade us that the alleged flaws in Smock's testimony go to the weight of his testimony, not to its admissibility.

{30} This distinction between weight and admissibility highlights our difficulty with the position advanced by the dissent. The dissent promotes the view that a trial court should insert itself into disputes among experts and exclude expert opinions that the court concludes are based on flawed methodology. The danger with this approach is that in many instances a trial court will become a third expert who assesses the strengths and weaknesses of competing opinions and who ultimately eviscerates one party's case by excluding its expert's testimony. Instead of allowing a trial court to resolve such a conflict between experts, our Supreme Court has properly determined that this assessment is best left to the fact finder.

{31} Before concluding our discussion of this issue, we briefly mention our recent opinion in *State v. Day*, 2006–NMCA–124, 140 N.M. 544, 144 P.3d 103, *cert. granted*, 2006–NMCERT–009, 140 N.M. 543, 144 P.3d 102. In that case, we reversed the defendant's DWI conviction based on insufficient evidence, holding that scientific evidence was required to relate the defendant's BAC, measured an hour and six minutes after the defendant was driving, to the time of driving.

*Id.* ¶ 2. In that opinion we made several statements suggesting that any retrograde extrapolation testimony should include information regarding the variables upon which Reyes placed so much emphasis in the present case. *See id.* ¶¶ 4, 21, 25 (stating that evidence regarding the defendant's characteristics and the consumption of food and alcohol "will likely be required" because they affect absorption and elimination). In addition, we said that

[a] court evaluation of the reliability of retrograde extrapolation evidence presented in expert testimony should take into consideration the relevant factual circumstances. Ambiguous or insufficient facts will often make an expert's opinion of the BAC at an earlier driving time supported by nothing more than arbitrary assumptions and therefore a scientific absurdity.

*Id.* ¶ 19 (citation omitted).

{32} While these comments appear to support Defendant's position in this case, we do not consider ourselves bound by them because they exceeded the scope of *Day's* holding. *See Phoenix Indem. Ins. Co. v. Pulis*, 2000–NMSC–023, ¶ 18, 129 N.M. 395, 9 P.3d 639. The holding in *Day* was simply that scientific evidence was necessary to relate a BAC result obtained one hour and six minutes after driving to the time of driving. The particulars of retrograde extrapolation and its reliability were not necessary to that holding.

{33} In summary, we hold that the trial court did not abuse its discretion in admitting Smock's testimony. We are not implying that retrograde extrapolation is a scientifically valid and reliable technique as a matter of law. Defendant's expert did not challenge the validity of retrograde extrapolation as a scientific technique, but there may be other cases where such a challenge is made. In this case Defendant's challenge was to Smock's conclusions based on the technique, and Defendant had the opportunity to highlight the deficiencies in Smock's calculation for the jury. Under these circumstances and consistent with our Supreme Court's guidance in the *Alberico* line of cases, evaluation of Smock's testimony was for the jury.

## B. Speedy Trial Analysis

{34} Defendant contends his right to speedy trial was violated by the 30–month delay from the time of his arrest to his trial. The trial court denied Defendant's motion to dismiss the charges on this basis, finding that (1) "Defendant ... has participated in the delays that have occurred in bringing this case to trial[,]" (2) "Defendant is not in custody[,]" and (3) "Defendant did not assert a demand for speedy trial until late in the proceedings."

{35} The constitutional right to speedy trial attaches when a defendant becomes an accused, *State v. Laney*, 2003–NMCA–144, ¶ 10, 134 N.M. 648, 81 P.3d 591, which in this case occurred when Defendant was arrested on July 14, 2001. A defendant who claims violation of the right must make an initial showing that the length of the delay is presumptively prejudicial. *Id.* If the defendant makes that showing, "the burden of persuasion shifts to the State to show, on balance, that the four factors [from *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ] do not weigh in favor of dismissal." *Id.* The four factors are: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant." *Id.* (internal quotation marks and citation omitted). Although our review is deferential to the trial court's fact finding, we conduct an independent evaluation of the four factors. *Id.*

### 1. Length of the Delay

{36} In assessing the length of the delay we first determine whether the delay is presumptively prejudicial. *Id.* If it is, we continue with further analysis. Our Supreme Court has held that "a minimum of nine months delay is necessary to trigger further inquiry ... in simple cases, twelve months in cases of intermediate complexity, and fifteen months in complex cases." *State v. Coffin*, 1999–NMSC–038, ¶ 56, 128 N.M. 192, 991 P.2d 477. While the trial court never made a finding on presumptive prejudice, Defendant contends this case is a simple one and the State claims it is of interme-

diate complexity. We agree with the State. A simple case generally requires less investigation and tends to rely primarily on the testimony of police officers. *State v. LeFebre*, 2001–NMCA–009, ¶ 11, 130 N.M. 130, 19 P.3d 825. Here, Defendant faced the serious charge of vehicular homicide, the trial lasted three days, and there were sixteen witnesses, five of whom were experts. *See Laney*, 2003–NMCA–144, ¶ 14 (noting that trials of intermediate complexity "seem to involve numerous or relatively difficult criminal charges and evidentiary issues, numerous witnesses, expert testimony, and scientific evidence"). Because a twelve-month delay is presumptively prejudicial in an intermediately complex case, we conclude Defendant has met his initial burden, and we proceed to weigh the length of delay against the other factors. *Id.* ¶ 11 (explaining that if a delay is presumptively prejudicial, "we balance the length of the delay against the remaining three factors to assess whether the constitution has been violated").

{37} Before proceeding to the other factors, we consider whether the delay beyond the presumptively prejudicial period weighs against the State. *Id.* ¶ 16. The length of delay is eighteen months beyond the minimum period. Because the presumption of prejudice to the defendant intensifies over time, we conclude that this relatively long period of additional delay should weigh against the State.

## 2. Reasons for the Delay

{38} "We examine the reasons for delay, allocating the reasons for the delay to each side and determining the weight attributable to each reason." *State v. Plouse*, 2003–NMCA–048, ¶ 45, 133 N.M. 495, 64 P.3d 522 (internal quotation marks and citation omitted). In doing so, we consider the State's role in causing the delay. The State's culpability runs the gamut from light—for negligent delay, such as that related to caseload—to heavy, for intentional delay, such as tactical delay. *Laney*, 2003–NMCA–144, ¶ 17.

{39} The trial court originally scheduled the trial for March 4–6, 2002. In January 2002, defense counsel told the prosecutor that Defendant had undergone heart surgery in early January and that he would not be released by his doctor in time for the March trial setting. Defendant concurred in the State's motion seeking an extension of the six-month rule until June 18, 2002. Although this delay should not weigh against Defendant, neither should it weigh against the State. *See In re Darcy S.*, 1997–NMCA–026, ¶ 28, 123 N.M. 206, 936 P.2d 888 (explaining that "delays attributable to the defense are not charged against the State").

{40} The trial court rescheduled the trial for October 7–11, 2002. It is not clear from the record why the trial was scheduled to take place so long after expiration of the initial extension, but because there is no other explanation for it, we can reasonably assume this setting was the first available to the trial court. In any event, at a hearing on conditions of release in May 2002, the trial court noted that the extension was not long enough, and both the prosecutor and defense counsel stated they had agreed to an additional extension through the last day set for trial. Consequently, this extension should not weigh against the State either. *Id.; see also State v. Ortiz–Burciaga*, 1999–NMCA–146, ¶ 32, 128 N.M. 382, 993 P.2d 96 (declining to attribute to either party court's inability to schedule trial).

{41} Another series of events accounted for the next period of delay in this case. On October 29, 2001, which was several months before the initial trial setting, Defendant moved for production of the grand jury tapes, and the trial court granted the motion on October 31, 2001. Based on the tapes, Defendant ultimately asked the trial court to quash the indictment, but he did not file this motion until August 7, 2002, nearly ten months after obtaining the tapes. The trial court granted the motion and quashed the indictment on October 7, 2002. While the defect in the indictment may be attributable to the State because it failed to present exculpatory evidence to the grand jury, Defendant was responsible for the long delay in moving to quash the indictment.

{42} Upon remand to the magistrate court after the indictment was quashed, Defendant

moved for a continuance of the preliminary hearing on the ground that defense counsel had a scheduling conflict. Defendant then agreed to a 60-day extension of the hearing. When the trial was scheduled for August 2003, Defendant moved for a continuance because the trial court had scheduled a one-day trial rather than a five-day trial. As a result of this continuance, the State requested an extension of the six-month rule, which was granted through March 20, 2004. The trial ultimately took place in January 2004.

{43} In summary, the only delay attributable to the State flowed indirectly from its failure to present exculpatory evidence to the grand jury. While this failure weighs heavily against the State, we note that Defendant could have moved to quash the indictment on this basis as soon as the grand jury tapes were ordered to be produced, which was within four months of Defendant's arrest. Instead, Defendant waited ten months from the tapes' production to file his motion. In light of this, the trial court's heavy docket, and the partial responsibility Defendant bears for all other delay, we conclude that this factor overall weighs only moderately against the State.

**3. Assertion of the Right**

 {44} Defendant first asserted his right to a speedy trial when he filed a motion to dismiss on that ground on January 15, 2004. This was eleven days prior to trial and thirty months after Defendant's arrest. Consequently, we conclude this factor does not weigh in Defendant's favor. *See Coffin*, 1999–NMSC–038, ¶ 67 (concluding that assertion of speedy trial right two weeks prior to trial did not weigh in favor of the defendant).

**4. Prejudice**

 {45} "The right to a speedy trial protects the following three interests of a criminal defendant: (i) to prevent oppressive pretrial incarceration[,] (ii) to minimize anxiety and concern of the accused[,] and (iii) to limit the possibility that the defense will be impaired." *Id.* ¶ 68 (internal quotation marks and citation omitted). To establish prejudice, "the evidence [must show] a nexus between the undue delay in the case and the prejudice claimed." *Laney*, 2003–NMCA–144, ¶ 25 (alteration in original) (internal quotation marks and citation omitted).

 {46} Defendant contends he was prejudiced in three ways. First, he claims the publicity surrounding the accident was pervasive. Second, he suffered anxiety and concern over the charges against him. Third, he argues that the delay of the trial impaired his defense due to the fading of witnesses' memories. These claims relate to two of the three interests protected by the right to speedy trial; Defendant does not claim oppressive incarceration because he was released on bond during the pretrial period.

{47} All defendants experience pretrial anxiety and concern. The question is whether these concerns caused undue prejudice. *See United States v. Henson*, 945 F.2d 430, 438 (1st Cir.1991) ("[C]onsiderable anxiety normally attends the initiation and pendency of criminal charges; hence only undue pressures are considered." (internal quotation marks omitted)); *Coffin*, 1999–NMSC–038, ¶ 69 (noting that "the constitutional inquiry focuses on undue prejudice"). While we have no doubt that the delay of the trial caused Defendant stress, we conclude it weighs only lightly in his favor. Because Defendant was not incarcerated while awaiting trial, his anxiety was likely no greater than that experienced by other criminal defendants who await trial in jail.

{48} As for Defendant's claim that the delay impaired his defense, he points to a physician witness who testified that he no longer remembered certain aspects ·of his examination of Defendant. The witness, Dr. Patty, an internist and cardiologist, was hired by the defense to testify about the effects of diabetes. He wanted to examine Defendant before testifying and testified about this examination. Although Patty had moved and no longer had access to the record of this examination, he testified that Defendant suffered from some of the ramifications of diabetes, such as peripheral and visceral neuropathy, circulation problems requiring a shunt, and that Defendant had

arthritis. He testified at length about the effects of diabetes on the body, including visceral neuropathy's effect on the stomach's absorption rate and potential impairment of the ability to perform field sobriety tests, and about the effect of stress on a diabetic's body. On direct examination, Patty said nothing about his inability to recall anything. On cross examination, Patty said he could not recall the names of other physicians Defendant was seeing or the medications Defendant was taking.

{49} Defendant does not specify how Patty's fading memory impaired his defense, and we see nothing in Patty's testimony suggesting that Defendant's defense suffered as a result. To the contrary, it appears that Patty's lengthy testimony provided considerable support to the defense.

{50} In conclusion, any prejudice to Defendant resulting from the delay of the trial was not undue. In light of this and Defendant's considerable responsibility for the delay, we hold that Defendant's constitutional right to a speedy trial has not been violated.

## CONCLUSION

{51} For the foregoing reasons, we affirm Defendant's conviction.

{52} **IT IS SO ORDERED.**

I CONCUR: A. JOSEPH ALARID, Judge.

MICHAEL D. BUSTAMANTE, Judge (concurring in part and dissenting in part).

BUSTAMANTE, Judge (concurring in part and dissenting in part).

{53} I agree with the speedy trial analysis in Judge Fry's majority opinion, but I disagree with the evidentiary discussion. I have no quarrel with the discussion of prior cases dealing with application of the *Daubert/Alberico* standard in general. However, I do think that the opinion ultimately goes too far in finding a strict dichotomy between assessing the validity and reliability of scientific techniques versus deficiencies in the actual application of a technique or principle. As the opinion notes, courts are to consider the method used to generate offered scientific evidence. Thus, I disagree that New Mexico does not require a proponent of evidence to show " 'proper application of the technique on the occasion in question.' " Majority Opinion, ¶ 27 (quoting *Mata,* 46 S.W.3d at 908).

{54} There can be instances where application or performance of a valid and reliable technique is so flawed that the results are not trustworthy enough to be admissible. For example, an accident reconstruction opinion as to whether a party had sufficient time to avoid a collision would likely not be admissible if the expert refused to include a factor for driver perception and reaction time in the mathematical calculation or if the expert assumed a coefficient of friction that the scientific literature indicated was unrealistically high or low in the circumstances. This case presents a similar problem. I think the method used by the State's expert is so flawed that it cannot be deemed sufficiently reliable to be admitted.

{55} There is no need here to re-canvass the literature or case law concerning retrograde extrapolation. It is enough to acknowledge that the technique is recognized by the scientific community as "valid"; that is, a reasonably accurate—though not precise—calculation of BAC at a given time pretest can be achieved when the technique is correctly applied with sufficiently reliable data. The universally recognized difficulty with proper application of the technique is assuring that the various factors which can affect the final value dramatically are appropriately assessed, quantified and applied. Our opinion in *Day* discusses these factors at length. *Day* may be too categorical in its apparent requirement that all factors should be dealt with explicitly in all cases, but that does not erase the point that retrograde extrapolation in an uncontrolled environment is devilishly difficult.

{56} The State's witness evaded all of these difficulties through the use of assumption, negating any need to figure out how the considerations described in *Day* affected his work. He avoided the need to calculate an actual rate of elimination by using a range of values rather than calculating Defendant's specific rate. He could assume a range of values for the rate of elimination in this case

because the State did not care about proving a specific BAC; all it wanted to do was show some not insignificant level. In a case which does not require proof of a specific BAC, this approach might be acceptable since it appears that once a person is post-absorptive and post-peak, the rate of elimination—whatever it is—is reasonably constant for a given person. This aspect of the case clearly swayed the district court to admit the testimony.

{57} What destroys the trustworthiness of the approach here is the assumption that Defendant was post-absorptive when the accident occurred. I see no basis in the record for the assumption. Accepting the assumption turns the extrapolation into a simple arithmetic operation. No expertise is required to extrapolate if you assume all variables away. Given his unrealistic and unsupported assumptions, the State's expert's approach provides no more than theoretically possible values untethered from the actual case at hand. The fact that taking the usual factors into account yields values ranging from less than .04 to over .12 at the time of the accident tells me that the State's approach is not valid and should have been excluded.

{58} Proper assessment of method in this case would not have made the district court a "third expert." Rather, it would have been the essence of gatekeeping.